UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| AMBER BURNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-CV-017 |
| | ) | |
| UNIVERSITY OF TENNESSEE - KNOXVILLE, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

After being terminated from her employment while pregnant, plaintiff filed suit under Title VII of the Civil Rights Act of 1964 as amended by the Pregnancy Discrimination Act ("PDA"). Defendant has now moved for summary judgment [doc. 15]. Plaintiff has responded to the motion, and defendant has submitted a reply. For the reasons that follow, summary judgment will be granted and this case will be dismissed.

I.

*Background*

Plaintiff was hired in November 2006 as a veterinary assistant at the Large Animal Clinic of defendant's College of Veterinary Medicine. She was supervised by the Facilities Manager, Carolyn Wilson, who in turn reported to Dr. Robert Holland, Professor and Chair of the College of Veterinary Medicine.

The Large Animal Clinic treats ill animals such as horses, llamas, and cattle, some of which carry zoonotic diseases.[1] Animals known to be carrying a contagious disease upon arrival are immediately placed in isolation. Animals not known to be carrying a contagious disease remain in the general population unless they are subsequently diagnosed as contagious. One job duty of veterinary assistants is to clean the stalls of diseased animals, necessitating exposure to urine and feces. The veterinary assistants generally perform this task in pairs but it is sometimes done individually.

In May 2007, plaintiff disclosed to Ms. Wilson that she was pregnant. According to plaintiff, Ms. Wilson "was excited. She was overjoyed, elated, said, oh, we haven't had somebody pregnant here and a baby in forever, this will be so exciting." [Plaintiff deposition, p. 54-55]. Based on a book she had read, plaintiff told Ms. Wilson that 20 pound maximum lifting restriction would be necessary during the pregnancy.

The Large Animal Clinic subsequently underwent a periodic safety inspection. Plaintiff testified that the safety inspectors "said that [Ms. Wilson] had mentioned something, that I had mentioned some restrictions, and they asked me if I would get a note . . . . And then the safety person . . . told me to just take [a job description] to my doctor and go over the list of job descriptions [sic] and see if I had any limitations or anything . . . ." [Plaintiff deposition, p. 56-57]. According to plaintiff's testimony, one of the safety inspectors "had

---

[1] A zoonotic disease is one that is "transmissible from animals to humans under natural conditions." *Dorland's Illustrated Medical Dictionary* 2000 (29th ed. 2000).

been pregnant herself, and she understood, too . . . and that's why she had told me to get some kind of limitations or just [sic] from my doctor . . . ." [Plaintiff deposition, p. 57].

Plaintiff provided defendant with a paper, in her own handwriting, purporting to be a list of limitations orally obtained from treating gynecologist Heather Moss in response to questions asked by plaintiff at her most recent appointment. That paper read in material part,

> [Question:] How about diseases (what to stay away from)? [Answer:] Salmonella, rota virus, brucellosis, crypto strep, Q Fever. Stay away from all: use precautions.
>
> . . .
>
> [Question:] Is it o.k. to go to necropsy? [Answer:] No contact with dead diseased animals . . . .

A meeting was then held on July 12, 2007, between plaintiff, Ms. Wilson, and others. Ms. Wilson informed plaintiff that she should begin looking for another job within the university system. Ms. Wilson

> said to [plaintiff] that I had talked with Dr. Holland and together we could not define jobs that she could preform [sic] within our Dept. I talked about the nature of her job and the fact that she would be exposed to animal disease and not know until it was to [sic] late. I reminded her about delayed test results. [Plaintiff] stated this was a personal attack and she could do her job.

Plaintiff subsequently met with Mary Lucal of defendant's human resources department. Plaintiff pursued other available jobs within the university but was not selected for any of them.

Dr. Moss then sent a letter to Ms. Lucal. That letter, dated July 17, 2007, read in full,

> In respect to [plaintiff's] pregnancy, she should have no contact with animals that have been placed in isolation.
>
> If there are questions, please feel free to contact our office.

Plaintiff met with Ms. Wilson and Dr. Holland on July 18, 2007, and was advised that she was being placed on paid administrative leave the following day "while we investigate your ability to perform the essential functions of your job." During that meeting, plaintiff complained that she was being discriminated against on the basis of her pregnancy.[2]

On approximately July 17, 2007, Dr. Moss made handwritten notations on a typed job description. Among those notations was the statement, "Recommend limited or complete avoidance of animal [sic] with difficult to treat diseases such as Q Fever, etc."

On August 3, 2007, plaintiff met with Dr. Holland, Ms. Wilson, and Ms. Lucal. According to defendant's notes from that meeting, Ms. Lucal gave plaintiff "4 options to consider": requesting a leave of absence without pay; resigning; being terminated; or "[s]peak with her doctor and have him [sic] review the list of restrictions and write us another letter that these restrictions have been lifted if this is his [sic] true feelings."[3] Consistent with

---

[2] However, plaintiff is unaware of any other Large Animal Clinic employee who was medically restricted from contact with diseased animals, or who was allowed to continue working under comparable restriction.

[3] Plaintiff had not been employed long enough to be eligible for Family and Medical Leave Act protection. *See* 29 U.S.C. § 2611(2)(A).

those meeting notes, plaintiff testified that she was told that she "couldn't have any restrictions whatsoever."

On August 22, 2007, plaintiff submitted another paper from Dr. Moss, upon which the physician had again made handwritten notations beside a list of typed job duties. In material part, Dr. Moss wrote, "Prefer minimal contact" with diseased animals.

No resolution was reached, and plaintiff was terminated on August 24, 2007. In November 2007, plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). An EEOC investigator later visited the Large Animal Clinic, and the synopsis of that visit includes the rationale for plaintiff's termination according to Dr. Holland.

> Dr. Holland stated after reading [plaintiff's] doctor's restrictions he personally felt the doctor was referring to salmonella. He stated this was understandable because he was very concerned with anyone being exposed to salmonella; he stated humans could get salmonella and it could go to the fetus. Holland stated the paperwork from [plaintiff's] doctor mentioned QFever which is a disease that sheep and goats get and can have long term health problems for an individual and a fetus.
>
> Dr. Holland stated during the summer there were a number of cases in hospitals where MRSA . . . was brought into a hospital. He stated he is concerned with all of his staff and their exposure but he was more concerned with [plaintiff] because of the [MRSA] and salmonella. Holland stated he was concerned with the injury of [plaintiff] as well as her fetus.
>
> Dr. Holland stated [plaintiff's] doctor's note was "very impractical" because animals come and go on a daily basis and [veterinary assistants] are exposed to them before they are diagnosed.

The EEOC's synopsis is consistent with Dr. Holland's later deposition testimony:

> Q: Why was [plaintiff] not allowed to continue to work during her pregnancy?
>
> A: We had written direction she was not supposed to be exposed to –
>
> Q: Well, the information that was provided ultimately said she was to have minimal exposure?
>
> A: She said there was supposed to be limited or no exposure.
>
> Q: Right.
>
> A: Was the wording. And you cannot limit exposure to something like salmonella or cryptosporidium.

The EEOC issued a right to sue letter on October 15, 2008. The present complaint timely followed. Therein, plaintiff alleges both disparate treatment and retaliation under Title VII.

II.

*Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party may discharge its burden by demonstrating that its opponent has failed to establish an essential element of that party's case for which it bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

6

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In order to defeat a motion for summary judgment, the non-moving party must present significantly probative evidence in support of its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255.

"It is well settled that the non-moving party must cite specific portions of the record in opposition to a motion for summary judgment, and that the court is not required to search the record for some piece of evidence which might stave off summary judgment." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997). A party responding to a summary judgment motion "*must* . . . set out *specific facts* showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2) (emphasis added).

The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law, *Liberty Lobby* at 251-52, but at summary judgment it is not the court's role to weigh evidence or to determine credibility. *See id.* at 255. Nonetheless, "evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue." 10A Charles Allan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2727 (3d ed. 1998).

III.

*Summary Judgment Analysis*

Title VII, as amended by the PDA, makes it unlawful for most employers to "discharge any individual, or otherwise to discriminate against any individual . . . , because of or on the basis of pregnancy . . . ." 42 U.S.C. §§ 2000e-2(a)(1), 2000e(k). Title VII also includes an antiretaliation provision, making it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a).

A. *McDonnell Douglas*

At summary judgment, the court evaluates a Title VII claimant's inferential and circumstantial evidence using the familiar *McDonnell Douglas* burden-shifting approach. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *EEOC v. Yenkin Majestic Paint*, 112 F.3d 831, 834 (6th Cir. 1997). In *McDonnell Douglas* the Supreme Court established "the order and allocation of proof in a private, non-class action challenging employment discrimination . . . ." *McDonnell Douglas*, 411 U.S. at 800-03.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 802. The elements necessary to make a *prima facie* showing will vary depending on the facts of each case and the type of discrimination alleged. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575-76 (1978). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has

presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007).

Plaintiffs bear the burden of persuasion throughout the entire process. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000). If a plaintiff is able to establish her *prima facie* case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer successfully provides such a reason, *McDonnell Douglas*'s regime then places the final burden on the plaintiff to "demonstrate by competent evidence" that the employer's proffered reason is in fact merely a pretext for unlawful discrimination. *Id.* at 805. Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

B. Disparate Treatment

A pregnancy discrimination claimant can establish her *prima facie* case by showing that: (1) she was pregnant; (2) she was qualified for her job; (3) she was subjected to an adverse employment action; and (4) there was a nexus between the pregnancy and the adverse action. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). Plaintiff has met her *prima facie* burden as to her discrimination claim. There is no dispute

9

that she was pregnant, that she was subjected to an adverse employment action (termination), or that she was otherwise qualified for her job. *See Tysinger v. Police Dep't of the City of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006) (employee's "qualified" status is considered in the absence of any limitations caused by the pregnancy). The court finds the fourth *prima facie* element to be satisfied as well. A nexus existed between plaintiff's termination and her pregnancy, as she was fired due to limitations caused by that condition.

The burden thus shifts to the defendant to put forth a legitimate, nondiscriminatory reason for the firing. Defendant has done so, articulating that due to limited staffing in the Large Animal Clinic it is impossible to provide a veterinary assistant with limited-to-no exposure to zoonotic disease as directed by Dr. Moss. While Dr. Moss at times referred only to animals in isolation, defendant points out that the very same contagions can be present in the general population prior to diagnosis. Because no other jobs were available to accommodate this restriction, plaintiff was terminated.

The burden now returns to plaintiff to show that defendant's explanation is a pretext for pregnancy discrimination. In an effort to do so, plaintiff cites what she terms "overwhelming and compelling . . . glaring inconsistencies in the Defendant's proof." Primarily, plaintiff criticizes the defendant for not telephoning Dr. Moss to obtain further clarification <u>after having already received four notes from that physician</u> indicating that plaintiff should not (at best) have significant contact with diseased animals - an unavoidable requirement of her job.

Plaintiff cites a discrepancy in the testimony of defendant's agents, and correctly points out that the inconsistency must be construed in her favor at summary judgment. Defendant's alleged policy is to require written - not oral - statements from physicians in order to avoid misunderstandings. However, the EEOC synopsis indicates that Ms. Lucal in fact "got in touch with" Dr. Moss and "had a short conversation." According to the EEOC, Ms. Lucal reported that during the conversation Dr. Moss "stated that [plaintiff] was to have no contact with animals that were diseased."

Plaintiff's point is that defendant in fact <u>will</u> contact a physician by telephone, and should have done so more than once if there were any lingering doubts as to plaintiff's ability to do her job. However, taking the EEOC synopsis as accurate, this evidence is not helpful to plaintiff in demonstrating pretext. Presuming that Ms. Lucal did in fact call Dr. Moss, plaintiff's proof shows that Ms. Lucal was told "that [plaintiff] was to have no contact with animals that were diseased." After having been told "no contact" on one phone call, it is unclear how any further clarification could have been necessary or useful.

In an attempt to explain that question, plaintiff has submitted a March 2010 affidavit from Dr. Moss. Therein, Dr. Moss attempts to explain what she actually meant by "limited" and "no" contact. This long-after-the-fact affidavit is of no benefit to plaintiff, as employment decisions are to be evaluated in light of the particularized facts that were before the employer at the time the decision was made. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006).

Plaintiff's telephone argument is best understood by a review of her deposition testimony. Therein, she explains why she feels that Dr. Holland's consideration of her work restrictions was incomplete:

> Q: What about instances where an animal had a disease that had not been diagnosed?
>
> A: It was fine, I could still be in there. If it had not been diagnosed yet, Dr. Moss - *that's what if they had called and clarified*, I could go into the stall if it had not been diagnosed yet. And once it was diagnosed, that's when she wanted me to have minimal contact with the animal.
>
> Q: She told you that?
>
> A: Yes. In several discussions. *And that's why I wanted someone from the University of Agriculture* [sic] *to contact her . . . .*
>
> Q: Dr. Moss told you that you could be in a stall with an animal with a transmittable disease so long as it had not been diagnosed; is that correct?
>
> A: If it hadn't been diagnosed yet. . . .
>
> Q: Maybe I'm confused here, because an animal with a disease is no more or less diseased after it's diagnosed, it's still transmittable before it's diagnosed. That was not a concern of hers?
>
> A: Not until – if it was diagnosed, she wanted me to have minimal contact . . . .
>
> . . .
>
> Q: And you said that was okay with Dr. Moss so long as the animal had not been diagnosed?
>
> A: If it had not been diagnosed yet, it was okay to go in a stall. Once it had been diagnosed with a disease that could be transferred from the horse to a human, I was supposed to have minimal contact.

[Plaintiff deposition, p. 115-17] (emphasis added).

Plaintiff's contention is simply implausible. Defendant made the decision that if a *diagnosed* zoonotically-diseased animal was a danger to plaintiff's unborn child (as repeatedly indicated by the treating gynecologist), then a *not-yet-diagnosed* zoonotically-diseased animal was also dangerous. Plaintiff's argument to the contrary could not possibly be credited by any rational jury.

Regardless, in contending that defendant should have placed another phone call to Dr. Moss, plaintiff ultimately is challenging defendant's business judgment as a means of showing pretext. "In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). Plaintiff has not shown that defendant failed to make a "reasonably informed and considered decision" in this case. After four written communications from (and one phone call with) the treating gynecologist, Dr. Holland determined that plaintiff could not safely work as a veterinary assistant under the conditions imposed by her treating physician. Plaintiff's argument does not "persuad[e] the court that a discriminatory reason more likely motivated the employer," nor does it "show[] that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

Plaintiff's other primary argument regarding pretext - that two other pregnant employees were allowed to continue working at the Large Animal Clinic - merits little discussion. Neither of those women had a physician-imposed contact restriction regarding contagious animals. Moreover, evidence that defendant did not discriminate against two other pregnant women is not helpful to plaintiff in her attempt to show that the proffered reason for her termination is in fact a pretext for unlawful pregnancy discrimination.

After-the-fact opinions and attacks on an employer's business judgment are insufficient to show pretext. *See Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 550 (6th Cir. 2004); *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). Plaintiff has not shown that the reason given for her termination was pretextual. Summary judgment must therefore be granted in defendant's favor on the disparate impact claim.

### C. Retaliation

Claims of retaliation are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). To demonstrate a *prima facie* case of retaliation under Title VII, a plaintiff must prove: (1) she engaged in activity protected by Title VII; (2) the exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against plaintiff or subjected her to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the adverse employment action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009). Plaintiff's proof satisfies the first,

second, and fourth of these prongs. She claimed pregnancy discrimination at the July 18, 2007 meeting with Ms. Wilson and Dr. Holland, and the alleged retaliatory acts took place within two to five weeks after that meeting. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 593-94 (6th Cir. 2006) (temporal proximity of "within two months" satisfies the causal connection prong in pregnancy discrimination case).

Plaintiff points to several alleged adverse employment actions to satisfy the third element of her *prima facie* case. One of those acts - her termination - is clearly sufficient. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (citations and quotations omitted). Being fired satisfies the "materially adverse" standard articulated in *Burlington Northern*. However, if termination is the only adverse employment action plaintiff is able to show, then her retaliation claim would ultimately fail at the pretext stage for the same reasons noted in the court's discussion of her disparate treatment claim.

The court's analysis must therefore turn to the other adverse employment actions alleged by plaintiff. First, plaintiff contends that Dr. Holland and Ms. Wilson became "angry" and/or "aggressive" after the July 18 meeting, but a litigant's conjecture or conclusory allegations are insufficient to survive summary judgment. *See, e.g., Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008). Hurt feelings and bruised egos do not

make an action "materially adverse."  *See, e.g., Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886 (6th Cir. 1996).

Next, plaintiff cites the August 3 meeting at which (approximately two weeks after her protected conduct) she was first told that *all* physician-imposed restrictions would have to be lifted in order for her to return to work.  "All" restrictions would include, for example, the previously accommodated lifting restriction.  At first blush, this argument is appealing.  However, in determining whether an employment action was materially adverse under *Burlington Northern*, "Context matters."  *Burlington N.*, 548 U.S. at 69.

Returning to plaintiff's briefing, the "all restrictions" issue is placed in context.  Therein, plaintiff stresses, "While Defendant goes on at some length about certain limitations and restrictions, it is clear the Defendant's basis for refusing to allow Plaintiff to continue employment as a Veterinary Assistant was due solely to the exposure issue.  Without the exposure issue, Plaintiff would have been allowed to continue working as a Veterinary Assistant."  [Doc. 22, p.24] (record citations omitted).  Therefore, by plaintiff's own admission, the "all restrictions" issue is inconsequential and did not affect her employment.  Plaintiff does not explain how an inconsequential act "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" as required by *Burlington Northern*.

Lastly, plaintiff cites defendant's failure to make additional phone calls to Dr. Moss as "sinister" evidence of retaliation.  For the reasons discussed in the preceding section

of this opinion, plaintiff's telephone issue is no more consequential than her "all restrictions" issue.

For these reasons, summary judgment must be granted in defendant's favor as to plaintiff's retaliation claim, resulting in the complete dismissal of the complaint. An order consistent with this opinion will be entered.

ENTER:

        s/ Leon Jordan
United States District Judge